**REVISED**

**UNITED STATES COURT OF APPEALS**

**For the Fifth Circuit**

---

No. 95-31239

---

PELICAN CHAPTER, ASSOCIATED BUILDERS & CONTRACTORS, INC., HARMONY
CORP., CAJUN CONTRACTORS, INC., and AUSTIN INDUSTRIAL, INC.

Plaintiffs-appellees,

VERSUS

HONORABLE EDWIN W. EDWARDS, K. DON PILGREEN and KEVIN REILLY

Defendants-appellants.

---

Appeal from the United States District Court
For the Middle District of Louisiana

November 25, 1997

Before KING, JOLLY and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

The Louisiana State Board of Commerce and Industry (Board) is authorized by the state constitution to "enter into contracts for the exemption from ad valorem taxes of a new manufacturing establishment or an addition to an existing manufacturing establishment, on such terms and conditions as the board, with the approval of the governor, deems in the best interest of the state."

La. Const. 1974, Art. 7, §21(F); See also La. Const. 1921, Art. 10, § 4(10)(substantially identical predecessor provision). Pursuant thereto, the Board incorporates in each such tax exemption its Rule One (Rule One), which requires that, inter alia, the manufacturer and its contractors in acquiring goods and services for the new or additional construction must give preference and priority to Louisiana manufacturers, suppliers, contractors and labor "except where not reasonably possible to do so without added expense or substantial inconvenience or sacrifice in operating efficiency." [1] In an action brought by the Pelican Chapter, Associated Builders and Contractors, Inc., (Pelican Chapter), and three of its members, the federal district court prospectively invalidated Rule One and

---

[1]Rule One provides:
> The Board of Commerce and Industry requires manufactures [sic] and their contractors to give preference and priority to Louisiana manufactures [sic] and, in the absence of Louisiana manufacturers, to Louisiana suppliers, contractors and labor, except where not reasonably possible to do so without added expense or substantial inconvenience or sacrifice in operating efficiency. In considering applications for tax exemption, special attention will be given to those applicants agreeing to use, purchase and contract for machinery, supplies and equipment manufactured in Louisiana, or in the absence of Louisiana manufacturers, sold by Louisiana residents, and to the use of Louisiana contractors and labor in the construction and operation of the proposed tax exempt facilities. It is a legal and moral obligation of the manufacturers receiving exemptions to favor Louisiana manufacturers, suppliers, contractors and labor, all other factors being equal.

enjoined the Chairman of the Board, the Governor, and the Secretary of the state Department of Economic Development from using it as a requirement of any future state ad valorem tax exemption.

The specific questions presented on appeal are (a) whether the Pelican Chapter and its members had standing to bring this action; and (b) whether the Board's challenged Rule One constitutes an unconstitutional burden on interstate commerce.

## I.

Plaintiffs-appellees are Pelican Chapter, an association of construction contractors, and three of its members, Harmony Corporation, Cajun Contractors, Incorporated, and Austin Industrial, Incorporated.[2] The member contractors are engaged in the business of constructing industrial plants in interstate commerce. The defendants-appellants are the Chairman of the Board, the Governor, and the Secretary of the state Department of Economic Development.

Prior to trial, the parties entered the following stipulation of established facts:

> 1. Rule One of the Louisiana Board of Commerce and Industry ("the Board") has long required favoring employment of Louisiana residents by contractors and subcontractors on industrial construction and improvement projects affected by the Industrial Tax Exemption Program administered by the Board.

---

[2]Pelican Chapter, Harmony Corporation, and Cajun Contractors, Incorporated are Louisiana corporations. Austin Industrial, Incorporated is a Texas corporation licensed to do business in Louisiana.

2.    In 1983, the Board, without adopting a formal rule, implemented a [sic] 80% policy relative to employment of Louisiana law [sic][labor].  The 80% Policy has been used as a benchmark or a "trigger" whereby if the Board or the Department of Economic Development conducted a background investigation and there was 80% or more labor from Louisiana, the Board would generally assume that the company did the best job it could in hiring Louisiana workers.  If it was below 80%, the Board asks the company to explain what efforts were made to hire Louisiana workers.

3.    The Associated Builders and Contractors and several of its members challenged Rule One, particularly its residency hiring restrictions in a rule making hearing and later before the entire Board.  The Board refused to alter its policies regarding either Rule One or any part of its residency hiring restriction.

4.    The 80% benchmark residency hiring restrictions of Rule One was a policy adopted by the Board in 1983.  It has never been formally adopted as a rule pursuant to Louisiana Administrative Procedures Act and the rule making powers of the Board or the Department of Economic Development.

5.    From the standpoint of the Board and the Department of Economic Development, there is no practical difference from the way it applies a policy as opposed to a formal rule.

6.    Rule One contains restrictions for the hiring of Louisiana labor, as well as use of Louisiana contractors and engineers and other Louisiana resources as well.  If Louisiana resources are available at the best price, all other factors being equal, then Rule One requires that recipients of the tax exemption use the Louisiana contractor, engineer, labor or other resources and that the recipient contractors do the same.

7.    The residency hiring restrictions of Rule One have been used in the past to limit or restrict the industrial tax exemption otherwise available.

4

8.    Typically, complaints concerning Rule One involving the failure to use Louisiana labor are received and investigated after most of the construction on the subject project has concluded.

9.    There has never been a study or analysis of the benefits to the State of Louisiana of the administration and enforcement of Rule One or of its residency hiring restrictions.

10.   There has never been a study or an analysis which has shown that by having and enforcing Rule One and its residency hiring restrictions, there is less unemployment in Louisiana.

11.   There is no empirical data whatsoever to show that the imposition, administration and enforcement of Rule One and its residency hiring restrictions have served to increase employment and decrease unemployment in Louisiana among Louisiana workers or Louisiana contractors.

12.   There exist [sic] no evidence or empirical data to show that more Louisiana workers are hired by the imposition or the residency hiring restrictions of Rule One or that the unemployment rate has in any way been effected [sic] positively or negatively by the administration and enforcement of the residency hiring restrictions of Rule One.

13.   Rule One has been applied by the Department of Economic Development and the Board in a manner so as to require applicants to prefer or show preference to Louisiana suppliers, Louisiana contractors and Louisiana labor over non-residents [sic] suppliers, contractors and laborers.

14.   No where [sic] in the documentation provided to any applicant for industrial tax exemption is the applicant informed that there is an 80% benchmark or trigger for residency hiring. It is not until and unless an investigation is commenced or inquiry is made that an applicant would learn that it was its obligation to ensure that at least 80% of the labor working on its construction project were [sic] from Louisiana.

5

15. In the investigations conducted by the Louisiana Department of Economic Development pursuant to Rule One and its residency hiring restriction, investigators inquire as to whether the recipient or their contractors are making a reasonable effort to hire Louisiana workers.

16. If the Board concludes that an applicant for an industrial tax exemption has not made a reasonable effort to retain Louisiana contractors or that it or its contractors have not made a reasonable effort to hire Louisiana labor, then the Board will consider a restriction or limitation of all or a portion of the industrial tax exemption applied for.

17. It is the policy of the Department of Economic Development and the Board that it is the responsibility of the applicant seeking the industrial tax exemption to abide by Rule One and that such applicants should pass the word down through their contractors and through their subcontractors that the Board and the Department of Economic Development expects [sic] Louisiana resources to be given an opportunity either to bid or to work.

18. According to the Board and the Department of Economic Development, it is the responsibility of the applicant seeking the exemption to abide by Rule One and, in most cases, the applicant advises contractors, subcontractors, etc., to do likewise because obviously, it could cost them money if they don't.

19. The Board and the Department of Economic Development consider the residency hiring restrictions of Rule One an obligation of the contractor of the recipient and not just an obligation of the recipient.

20. If a contractor of a recipient of an industrial tax exemption is found to be in violation of the residency hiring restrictions of Rule One because that contractor is perceived to have not made a reasonable effort to use Louisiana labor, such would be reflected in the exemption or the limitation of exemption for the applicant.

6

21. Because Rule One requires manufacturers "and their contractors" to give preference to Louisiana contractors and labor, it is the policy of the Board that Rule One also applies to contractors of the applicants. Thus, if a contractor violates Rule One, then it is going to reflect on the applicant's status and whether or not the applicant receives the full tax exemption or has such limited.

22. The Board and the Department of Economic Development have continued to investigate complaints alleging violation of the residency hiring restrictions of Rule One for the purpose of reporting any perceived violations to the Board.

At trial, Pelican Chapter and its members presented evidence of the burdens and costs that compliance with Rule One imposes upon them and other contractors in connection with industrial construction in Louisiana. They introduced numerous exhibits, the testimony of three representatives of construction contractors, and the testimony of the Director of the Financial Division of the Office of Commerce and Industry.

The representatives of the construction contractors testified that, in order to avoid the drastic consequences of being found in violation of Rule One by the Board, their firms will not hire a person for a Louisiana project without absolute proof of his or her Louisiana residency. They said this policy, common among construction firms, causes the employer to avoid the use of experienced, long-term non-resident employees and highly qualified and efficient non-resident subcontractors. Also, additional administrative costs result from the employer's efforts to exhaust all available Louisiana resources before using products or services

7

of another state. More intensive recordkeeping is required in case it becomes necessary to justify the use of a particular product or employee. Consequently, they testified, projects located near state borders involve even heavier burdens and expenses because the local labor supply consists partly of non-residents. The plaintiffs' witnesses explained that Rule One's lack of specificity as to acceptable margins of error and the complexity of proof of residency in many instances further aggravated compliance costs. Exhibits illustrating and corroborating the witnesses' testimony regarding the additional administrative costs and recordkeeping associated with Rule One compliance were also introduced by the plaintiffs.

The defendants presented no evidence controverting the testimony of the plaintiff's witnesses or their exhibits. In fact, the defendants presented very little evidence at trial. Exhibits introduced by the defendants indicate that from 1936 to 1993 the Rule One related industrial tax program resulted in over 15,000 exemptions to various applicants in the amount of four billion dollars on construction projects costing over 44 billion dollars.

After the trial, the district court granted the requested relief. At the outset, the district court held that the plaintiffs had standing to challenge the Board's Rule One because they suffered injury due to its enforcement despite the fact that they had no contractual relationship with the state. Because manufacturers customarily require contractors to secure them

8

against loss due to any noncompliance with Rule One, the court reasoned the contractors are burdened by the additional costs of self insuring against the risk of noncompliance, investigation and record keeping pertaining to residences of laborers and suppliers, and loss of efficiency and flexibility in acquiring materials and work force management.

Proceeding to the merits, the district court found that Rule One is not neutral on its face and actually discriminates against the use of out of state workers and suppliers in favor of their local counterparts. Rule One discourages use of out of state workers or suppliers by effectively assigning contractors the potential burden of showing after the fact, often long after project completion, that any such use was cheaper, more convenient or more efficient than granting local preferences. The court therefore held that Rule One unconstitutionally discriminated against commerce and enjoined its application. See <u>Pelican Chapter, Associated Builders and Contractors, Inc. v. Edwards</u>, 901 F.Supp. 1125 (M.D. La. 1995). This appeal followed.

## II.

In this Court, the defendants-appellants renew their argument contesting the standing of Pelican Chapter and its members to prosecute this action. The irreducible minimum of standing contains three elements. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992). "First, the plaintiff must have suffered an injury in fact---an invasion of a legally protected interest which is

9

[]concrete and particularized," id., at 560; Allen v. Wright, 468 U.S. 737, 756 (1984); Warth v. Seldin, 422 U.S. 490, 508 (1975); Sierra Club v. Morton, 405 U.S. 727, 740-741, n.16 (1972); and 'actual or imminent, not "conjectural" or "hypothetical"', Lujan, 504 U.S. at 560; Whitmore v. Arkansas, 495 U.S. 149, 155 (1990); Los Angeles v. Lyons, 461 U.S. 95, 102 (1983). "Second, there must be a causal connection between the injury and the conduct complained of---the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Lujan, 504 U.S. at 560; Simon v. Eastern Ky. Welfare Rights Org'n., 426 U.S. 26, 41-42 (1976). "Third, it must be likely, as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Lujan, 504 U.S. at 561; Simon, 426 U.S. at 38.

"The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan, 504 U.S. at 561; FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990); Warth, 422 U.S. at 508. "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan, id.

We agree with the district court's finding that the plaintiffs satisfactorily proved the requisite elements of injury, causal

10

connection, and redressability. The plaintiffs established, with little or no resistance by the defendants, that the existence of Rule One presents them with a Hobson's choice, viz., they must either (a) forego bidding on tax exemption applicants' projects, which represent a substantial percentage of the market and their own businesses, or (b) undertake the extra burdens and costs of complying with Rule One, which tend to deprive them of the competitive and economic advantages they otherwise would be able to earn through more flexible, effective and efficient purchasing, administrative, and employment techniques and methodology.

As the Supreme Court in Lujan, 504 U.S. at 561 observed:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be . . . proved . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or foregone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

There is little or no question that the contractor plaintiffs in this case, as are other contractors that engage in industrial construction for tax exemption applicants, are the objects of the State's action through Rule One to prevent them from dealing freely in interstate commerce for products and services of other states, that the Board knowingly and effectively encourages tax exemption

11

applicants to require contractors to indemnify them against any loss due to non-compliance with Rule One, that the increased costs of doing business imposed on contractors by Rule One cause them injury, and that the contractors' injury would be redressed if Rule One were to be declared invalid and its enforcement enjoined.[3]

### III.

The Commerce Clause of the United States Constitution grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art I, § 8, cl. 3.  "'Although the Clause thus speaks in terms of powers bestowed upon Congress, the Court long has recognized that it also limits the power of the States to erect barriers against interstate trade.'" Maine v. Taylor, 477 U.S. 131, 137 (1986) (quoting Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 35 (1980)).  "The bounds of these restraints appear nowhere in the words of the Commerce Clause, but have emerged gradually in the decisions of [the Supreme] Court giving effect to its basic purpose." Philadelphia v. New Jersey, 437 U.S. 617, 623 (1978).  The basic principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control the economy, "including the vital power of erecting customs barriers against foreign competition," has as its corollary that the states are not

---

[3] Pelican Chapter has standing under the principle of "associational standing" as enunciated in Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 342 (1977) and Warth v. Selding, 422 U.S. 490, 511 (1975).

12

separable economic units. <u>H.P.Hood & Sons, Inc. v. Du Mond</u>, 336 U.S. 525, 537-538 (1949). "[W]hat is ultimate is the principle that one state in its dealings with another may not place itself in economic isolation." <u>Baldwin v. G.A.F. Seelig, Inc.</u>, 294 U.S. 511, 527 (1935).

The opinions of the Supreme Court reflect an "alertness to the evils of 'economic isolation' and 'protectionism,' while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." <u>Philadelphia v. New Jersey</u>, 437 U.S. at 623-624. "Thus, where simple economic protectionism is effected by state legislation, a virtually <u>per</u> <u>se</u> rule of invalidity has been erected." <u>Id</u>. at 624 (citing <u>H.P. Hood & Sons, supra</u>, <u>Toomer v. Witsell,</u> 334 U.S. 385, 403-406 (1948); <u>Baldwin, supra</u>; <u>Buck v. Kuykendall</u>, 267 U.S. 307, 315-316 (1925)). As Justice Cardozo stated, "Restrictions so contrived are an unreasonable clog upon the nobility of commerce. They set up what is equivalent to a rampart of customs duties designed to neutralize advantages belonging to the place of origin." <u>Baldwin</u>, 294 U.S. at 527.

Rule One, in effect, conditions the exemption of new or added manufacturing establishments from state property taxes upon the preferential use of Louisiana construction products and labor when they are on parity with those produced by another state. Because Rule One serves to further no end other than the economic welfare of Louisiana and discriminates against articles and services in

interstate commerce solely because of they are produced by another state, it is a simple measure of economic isolationism or protectionism that the United States Constitution forbids.

## A.

Although the Supreme Court has used a variety of formulations for the Commerce Clause limitation upon the states, the Court has "consistently distinguished between outright protectionism and more indirect burdens on the free flow of trade." Lewis v. BT Investment Managers, Inc., 447 U.S. at 36. In recent years, a comprehensive approach to determining when a state law violates the Commerce Clause has evolved. A state law that affirmatively discriminates, either facially or in practical effect, against interstate commerce is constitutionally valid only if the state shows that the law actually furthers a "legitimate local purpose" and that this purpose could not be served as well by available nondiscriminatory means. Oregon Waste Systems, Inc. v. Dept. of Envtl. Quality, 511 U.S. 93, 99-101 (1994), Maine v. Taylor, 477 U.S. at 138, Hughes v. Oklahoma, 441 U.S. 322, 336 (1979). A state law affirmatively discriminates against interstate commerce if it disadvantages interstate commerce relative to intrastate commerce. Oregon Waste Systems, Inc., 511 U.S. at 99. To be legitimate, the local purpose must be unrelated to economic protectionism. Wyoming v. Oklahoma, 502 U.S. 437, 454 (1992), New Energy Co. of Indiana v. Limbach, 486 U.S. 269, 274 (1988).

In contrast, state laws that regulate evenhandedly with only

14

incidental effects on interstate commerce are invalid only if the burden imposed on interstate commerce is "clearly excessive in relation to the putative local benefits." Oregon Waste Systems, Inc., 511 U.S. at 99 (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)).  A state law regulates evenhandedly when it is both facially neutral and treats interstate and intrastate interests equally. CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 87 (1987), Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 350-53 (1977).

B.

Applying these precepts to the present case, we conclude that Rule One discriminates against interstate commerce both on its face and in practical effect.  It is facially discriminatory, as tax exemption recipients and their contractors must give Louisiana products and labor preferential treatment "all other factors being equal."[4]  The overall effect of Rule One is discriminatory as it inhibits the ability of contractors to offer employment to out-of-state workers and to utilize supplies and other resources produced by other states.  Furthermore, compliance with Rule One imposes additional adminstrative and operating costs on contractors who choose to take advantage of resources with out-of-state sources relative to the costs incurred by contractors utilizing only local labor, contractors, and supplies.

Because Rule One discriminates against interstate commerce,

---

[4]Rule One, supra, note 1.

the burden is shifted to the defendants to show that Rule One serves a legitimate local purpose which could not be served as well by available nondiscriminatory means.  This they have not done.  The asserted purpose of Rule One, reducing unemployment in Louisiana, cannot save this rule.  Reducing unemployment by discouraging the use of out-of-state labor and products constitutes the patent economic protectionism that the Commerce Clause forbids.  "Neither the power to tax nor the police power may be used by the state of destination with the aim and effect of establishing an economic barrier against competition with the products of another state or the labor of its residents." Baldwin, 294 U.S. at 527.  In addition, even if reducing unemployment in Louisiana were a legitimate local purpose, the defendants-appellants have not produced any evidence to demonstrate that Rule One has actually served this purpose or that it could not be served as well by available nondiscriminatory means.

C.

Finally, we are not persuaded by the defendants-appellants' argument that Rule One's discriminatory tax exemption requirement falls within the narrow exception to the dormant Commerce Clause for states in their role as "market participants."  "[The market participant]'doctrine differentiates between a State's acting in its distinctive governmental capacity, and a State's acting in the more general capacity of a market participant; only the former is subject to the limitations of the negative Commerce Clause.'" Camps

16

Newfound/Owatonna v. Town of Harrison, 117 S.Ct. 1590, 1606 (1997)(quoting New Energy Co. of Indiana v. Limbach, 486 U.S. at 277 (1988)). See White v. Massachusetts Council of Constr. Employers, Inc., 460 U.S. 204, 208 (1983)(Boston participated in the construction industry by funding certain projects); Reeves, Inc. v. Stake, 447 U.S. 429, 436-437 (1980)(South Dakota participated in the market for cement as a seller of the output of the cement plant that it owned and operated); Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 806 (1976)(Maryland, in effect, entered the market for abandoned auto hulks as purchaser by providing bounties for their removal from streets and junkyards).  For purposes of analysis under the dormant Commerce Clause, a state acting in its proprietary capacity as a purchaser or seller may "'favor its own citizens over others.'" Camps Newfound/Owatonna v. Harrison, 117 S.Ct. at 1606 (quoting Alexandria Scrap, 426 U.S. at 810).

Rule One's tax exemption prerequisite cannot be characterized as a proprietary activity falling within the market participant exception.  The tax program of which Rule One is a part has the effect of subsidizing  the initiation, relocation or expansion of industry, as do many dispositions of the tax laws. See New Energy Co., 486 U.S. at 277.  "'That,'" the Supreme Court has explained, "'does not transform it into a form of state participation in the free market.'" Camps Newfound/Owatonna, 117 S.Ct. at 1607 (quoting New Energy Co., 486 U.S. at 277).  The function of Rule One and the state tax program of which it is an element is neither the purchase

17

nor the sale of construction materials or services, but the "'assessment and computation of taxes--a primeval governmental activity.'" Id. "A tax exemption is not the sort of direct state involvement in the market that falls within the market-participation doctrine." Id.

Conclusion

As was true in Camps Newfound/Owatanna and Bacchus Imports, Ltd. v. Dias, 468 U.S. 263 (1984), the facts of this particular case, viewed in isolation do not appear to pose any threat to the health of the national economy. Nevertheless, the history of Commerce Clause jurisprudence has shown that even the smallest scale discrimination can interfere with the project of our federal union. As Justice Cardozo recognized, to countenance discrimination of the sort that Rule One represents would invite significant inroads on our "national solidarity":

> The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not in division.

Baldwin, 294 U.S. at 523.

The judgment of the district court, insofar as it prospectively invalidates and enjoins the enforcement of Rule One, is AFFIRMED.

18